---

### WALKER et al. v. HOUGHTELING et al.

(Circuit Court of Appeals, Seventh Circuit. August 12, 1902.)

No. 858.

1. FRAUDULENT CONVEYANCES—TRANSFER OF PROPERTY TO RELATIVE.
    The fact that a creditor preferred by an insolvent debtor is a relative is not in itself a badge of fraud, but is a circumstance to be considered and given its due weight in determining the good faith of the transaction, and whether a transfer of property by the debtor was in fact made in payment of a just debt.

---

¶ 1. See Fraudulent Conveyances, vol. 24, Cent. Dig. §§ 329, 330.

**2. EXECUTION—SUIT BY CLAIMANT OF PROPERTY—EVIDENCE CONSIDERED.**
Evidence examined, and *held* insufficient to support the claim that a bill of sale of property executed by a mother in favor of her children, at a time when an action was pending against her, was made in good faith in payment of an actual indebtedness owing from her to the children, or that it was delivered prior to the levy of an execution, issued upon the judgment recovered against her in the action, on the property.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

See 100 Fed. 253, 104 Fed. 513, 107 Fed. 619.

In 1899 the appellee Marcia E. Houghteling commenced an action at law in the court below against James H. Walker and Emeline Tate Walker, his wife, substantially to charge the latter with the rental of a house occupied by them and leased to the husband. Liability was predicated upon the statute of Illinois, which charges the property of both husband and wife, or of either of them, for the expenses of the family and the education of the children. The trial of the suit began on the 3d day of January, 1900, and judgment was rendered January 25, 1900, in favor of the plaintiff in that suit against both of the defendants. The judgment was appealed to this court, and affirmed. Walker v. Houghteling, 46 C. C. A. 512, 107 Fed. 619. On January 26th, execution was issued upon that judgment, and delivered for execution to the appellee John C. Ames, marshal of the United States for the Northern District of Illinois, and on the 27th of January he levied the same upon the personal property in the residence of the defendants to the writ. Thereupon, on January 29, 1900, the appellants here, who are the children of Mr. and Mrs. Walker, the judgment debtors in the writ, filed their bill in the court below against the appellees, claiming to be the owners of and in possession of the property so levied upon, and praying that the appellees, the defendants to the bill, might be enjoined from interference with the property and directed to surrender the same to them. On January 31, 1900, the court ordered that the marshal deliver the goods to the complainants upon filing with the clerk their bond, with surety, conditioned that in default of prosecuting their bill to effect they should pay the amount of the judgment recovered in the suit referred to, which bond was approved and filed. The answer substantially pleaded title in the judgment debtors. The matter was referred to a master to take testimony and report conclusions, and on February 8, 1901, he returned the testimony taken by him between April, 1900, and January, 1901, with his conclusions thereon.

In 1893, Mr. Walker, Sr., was a member of the corporation of James H. Walker Company, doing a large wholesale and retail business in the city of Chicago. The corporation failed during the panic of that year. The son had been in the service of the company, and was then 24 years of age. The age of the daughter does not appear definitely, but she was a minor. Both of them resided with their parents, and still so reside, paying nothing for their maintenance. The father, by reason of financial disaster, became, in part at least, unable to support the family, and it is claimed that the daughter, at some time between 1893 and 1896, advanced to the mother for the support of the household the sum of $500, upon the understanding or agreement that she should be refunded the amount; that the son, during the same period, advanced some $30,000 to his mother for the same purpose and upon a like understanding. The son entered into the dry goods commission business with a capital of eight or nine hundred dollars, and also became a broker trading upon the board of trade, where he claims to have made much money. On January 9th, during the trial of the suit at law, or while the cause was under consideration by the court, Mrs. Walker signed a bill of sale to her children, by which she undertook to sell to them "all my remaining household effects and books, also every article of furniture, pictures, and bric-a-brac that I possess. All equity in my mortgage against John L. Cochrane on North State street, and all my equity in the following life insurance policies: policy No. 132,683 in the Northwestern Mutual of Milwaukee; policy No. 159,526 in the Northwestern Mutual of Milwaukee;

policy No. 227,359 in the Equitable Assurance Association of New York." It is conceded that this bill of sale was signed by her in anticipation of a possible unfavorable result of the litigation, and to prevent the plaintiff in that suit from obtaining satisfaction of her claim out of the property; but it is also claimed by her that it was also executed to secure to her children the advances claimed to have been made by them to her. Whether and when this bill of sale was delivered—before or after the levy—was a question of contention before the master. The bill of sale was not recorded, but it was claimed that possession had been delivered—a symbolic delivery—by delivering to the son the key of the house. The master reported as follows:

"I find, first, that during the period referred to by the witness James H. Walker, Jr., there was advanced by him from time to time to his mother, Emeline Tate Walker, a large sum of money, the exact amount of which has not been definitely established, except as such advances are shown to have been made by his testimony.

"Second. That to secure the payment of said advances, Emeline Tate Walker, defendant in the judgment referred to, did on the 9th day of January, A. D. 1900, sign a bill of sale to the complainants of the property described therein, being the same property levied upon by the execution referred to, but

"I find and report that the testimony does not show that said bill of sale was actually delivered to the complainant before the levy of said execution; and

"I find that said bill of sale was not placed upon record, and that the defendants had no notice of its existence prior to or at the time of the levy referred to.

"I find further that upon the facts appearing from the testimony and the circumstances under which the alleged conveyance is shown to have been made, that it was not made in good faith, but that the purpose of said conveyance was to place the property beyond the reach of the judgment creditor, Marcia E. Houghteling, and given for the sole purpose of hindering and delaying creditors, and in fraud of them;

"And that the property mentioned and described in the amended bill was, at the time of the levy of said execution, the property of Emeline Tate Walker.

"I therefore find and report that the allegations of the complainants' bill and amended bill are not sustained by the proof, and I therefore recommend that the bill and amended bill be dismissed for want of equity."

The court below overruled the exceptions to the master's report, and dismissed the bill for want of equity, from which ruling this appeal is taken.

John M. Harlan, for appellants.

Frank Johnson, Jr., for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

In the absence of restrictive legislation, a debtor may prefer one creditor to the exclusion of another. Such act, in a sense, may hinder and delay the unpreferred creditor, but is not for that reason alone unlawful. "The test to be applied is whether the debtor, in exercising the privilege of making the preference, acts in good faith, with the intent to pay, or secure the payment of, a just indebtedness against him, and he cannot be deprived of the right on the ground that he knows or intends that the preference given to one creditor, to the extent such preference shall be available and effective, will operate to hinder and delay other creditors." Nelson v. Leiter, 190 Ill. 414, 422, 60 N. E. 851. We are therefore to consider whether

the bill of sale in question was in fact executed in good faith, with honest intent to secure an actual indebtedness. There also arises upon this record the further question whether the bill of sale was in fact delivered prior to the levy. These may be considered together. We start with the concession that a conveyance to a relative to secure an honest debt is lawful. As an isolated fact, it is not in itself a badge of fraud. The fact of the relationship, however, is a circumstance to be considered and to be given its due weight in any investigation of circumstances surrounding the transfer of property by an insolvent debtor, and a court of equity should carefully scrutinize such a transaction.

It is not essential to enter upon any elaborate review of the voluminous testimony in this record. We have given to it a careful scrutiny, and it is only needful to state some of the salient features of it which constrain our judgment. For some years Mr. Walker, Sr., was a successful merchant, maintaining his family, consisting of a wife, two sons, and a daughter, in a manner fitting to his position. Financial disaster overtook him in the panic of 1893, and temporarily, and for a period of about three years, disabled him, in part at least, in the support of his family. It is claimed that the appellant, Mr. Walker, Jr., then a young man of 24 years of age, who with a capital of eight or nine hundred dollars during the year 1893 started in business upon his own account, during that period of three years advanced to his mother from time to time, as a loan, some $30,000 for the support of the household, and that the daughter, then a minor, also advanced the sum of $500. This money of the son is claimed to have been made upon the board of trade, which is not impossible, and as the master has found that advances were made by him to a large and indefinite amount, in the absence of direct testimony to the contrary, we are not disposed to question the fact. It is, however, a circumstance somewhat singular that until now the son, claiming to make these large advances as loans to be repaid by his mother, should for a period of 10 years after his majority have lived in the family upon the bounty of his mother, without paying or crediting her for his support. It is also a circumstance somewhat remarkable, if it was understood and agreed that these advances should constitute an indebtedness by mother to son, that no account of the advances should have been kept by either; the mother being wholly unable to state any amount, and the son being able to state in part the amount, and that by loose bank checks in his possession. There was not only no legal or moral duty resting upon the father and mother to support the son, but there was moral if not legal duty resting upon the son under the circumstances to contribute, so far as his circumstances would permit, to the support of his parents. Under such circumstances it is incumbent upon the son, claiming an indebtedness from the mother in preference of another creditor, to show clearly that there was an express agreement that the advances should constitute an indebtedness to be paid—one which could be enforced by legal action. We are not satisfied from the evidence that there was such an understanding. These advances seem to have ended in the early part of the year 1896, when the

father again became able to support his family. The mother had some independent property, not sufficient to pay these advances. She was not earning money, nor, so far as the record discloses, in a position to pay the debt—if debt there was—otherwise than by subjecting the property she then had to that debt. And yet, from the year 1896 to the present, there was no accounting between the assumed debtor and creditor; no demand or suggestion of payment by the son; no request for security, and no suggestion of it, until after the commencement of the trial by Mrs. Houghteling against the mother, and then it came from the mother, not from the son, and for the avowed purpose of defeating Mrs. Houghteling's claim. On January 9, 1900, while the suit against the mother was either upon trial or had been submitted to the court for decision, Mrs. Walker, becoming fearful of an adverse decision, obtained a blank bill of sale, which she filled up, conveying all her property to her three children, one of them being a minor son who had not, so far as the record discloses, made any advance to the mother. Her thought was, she says, to give all her property to her children, but she subsequently erased the name of the minor son. The testimony concerning this bill of sale and its delivery is peculiar. That it was signed and acknowledged on the 9th day of January is made certain, not by the testimony of the mother or of the son, but by the testimony of the attorney, the notary, and the witness. The testimony of the mother and son are in direct conflict with each other and with the testimony of the parties which makes certain the date of the execution. Indeed, it may be said that the testimony of each—mother and son— is in direct conflict with itself. The testimony of each is replete with contradictions and evasions upon material points in the case, and we are compelled to regard it as quite unreliable. Thus, the mother declares she filled up this blank bill of sale at her house, and when only her husband was present; that he went out and procured the necessary revenue stamps, which she canceled at the house, and she then handed the paper to her husband, and had not seen it since until the hearing. When it was called to her attention that the bill of sale was witnessed and was acknowledged before a notary, she declares that her husband got the persons to come to the house for that purpose, whereas, in fact, it was signed by her and acknowledged at the office of her attorney. The son asserted that he was present at the office of the attorney when it was signed and executed, which was untrue in fact, as he afterwards acknowledged when it was clearly shown that he was not there. The son states that subsequently the document was delivered to him by his father in the library of the house, his mother and sister being present; that he immediately handed it back to the father to deposit it in the lock box in the safety deposit vault to which both the father and son had access. This account is not corroborated by any one; not by the mother, who was examined as a witness, and who testified that she had not seen the bill of sale from the time it was executed, and by her given to her husband, down to the time of the hearing; and neither the father nor the sister, who were alleged to be present, were called to testify. It is sufficient to say that the testimony of the mother and

son is so contradictory and evasive that we cannot safely rely upon it.

The master found that the testimony does not show that the bill of sale was actually delivered before the levy of the execution. We cannot say that he erred in this conclusion of fact. He had the advantage of observing the behavior of these witnesses when upon the stand. We can only judge them by the recorded testimony, and upon that we are unable to say that there was ever any actual delivery of the bill of sale. It certainly was in the possession of the father after the alleged delivery, and was by him shown to the marshal who then had the writ of execution. The avowed intention of the mother, who executed this bill of sale without solicitation and upon her own motion, was to defeat the claim of Mrs. Houghteling. We are satisfied that it was not made in good faith; that it was not designed to place this property in the possession of the son and daughter for the purpose that out of it they might secure the payment of an honest debt. We think it was a mere subterfuge, and that the property remained in the control and custody of the mother. This conclusion is fortified by the fact that when an order of the court had been obtained to return the property levied upon, the appellants to furnish bond with the American Surety Company as surety, it became necessary to secure the company for its engagement. For this purpose the sum of $2,200 was borrowed of a bank to use as a cash indemnity with the surety company. The loan was made of the bank upon the security of the Cochrane mortgage mentioned in the bill of sale, and the son testified that the bank knew that the mortgage had been assigned to him, yet this loan of the bank was made upon the notes of the father and of the mother, and not of the son, and the money was paid in a check to their order, and indorsed to the son, who delivered it to the surety company. It also appeared by the record that in 1898, after his advances had ceased, loans were obtained upon the insurance policies and the Cochrane mortgage, aggregating $12,275, which money was received by him, and which he first stated was his own money and in his own possession, but subsequently said was received by his father and mother. It is somewhat remarkable that a mother who was anxious to have her son paid his debt, and a son who relied upon the payment of the debt, should not have suggested the application of a dollar of this money to the payment of the debt.

It is insisted that there was no delivery of possession; that the symbolical delivery by the father handing the key of the house to the son after assignment of the lease—if that, in fact, was done—was insufficient; that there was no actual, visible, and continued change of possession, the family remaining in possession, and the mother in control of the property, precisely as before the alleged sale. We deem it unnecessary to consider this branch of the case, as the marshal testified that prior to his levy the father exhibited to him the bill of sale, and was by him notified of the claim of the children. We assume, without deciding, that such notification put the appellee upon inquiry, and obviated the necessity of such change of possession as the law required.

It was incumbent upon these complainants to make good their claim to this property. They have failed to do this. They have failed to show satisfactorily delivery of this bill of sale. They have failed to show that it was made in good faith, with an honest design to secure a debt—if there was a debt. They have shown that it was made to hinder and delay the appellee in the collection of her debt. We find no occasion to disturb the finding of the master. The decree is affirmed.